[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
ARTICULATION
The court finds the following facts:
Re General Background
1. For over 30 years, the plaintiffs (Patrons) and the defendants (Konovers) had interests together in real estate (shopping centers, apartments, etc.) and in various entities which developed, owned or managed real estate. Their portfolio spanned the eastern United States and ultimately grew to more than 50 properties or entities. Some of the properties were managed by the Patrons, some by the Konovers and the rest by "others."
2. On September 1, 1988, the parties executed a formal written agreement (the Agreement) to terminate their long-standing joint ownership relations. By virtue of that Agreement defendants agreed to buy all plaintiffs' interests in all properties.
3. The Agreement contemplated that there would be a closing; that at closing, the properties would be transferred to the buyer; a cash payment and a mortgage would be given to the seller; and that after the closing, there would remain some items to be resolved, including "cash adjustments", "standard adjustments", "transaction costs", and "major obligations." Two of those post-closing items were at issue here — the "cash adjustments" and the "major obligations."
Re "Seven Days Interest"
Under the Agreement the closing was to occur on February 1, 1989. At the closing, the Konovers were to pay the Patrons one-half of the purchase price in cash. The closing did not occur on that day and the Konovers tendered no cash until February 8, 1989 when the cash was paid to Patrons.
5. The parties met for the closing on February 1, 1989 and began the closing activities. However, the Konovers were unwilling to pay the cash and otherwise consummate the transaction on that date. Konovers decided that the closing reconvene on February 8, 1989. Closing adjustments were to continue to be as of February 1, 1989. Patrons finally received the cash of $14,374,999.00 on February 8, 1989. CT Page 3600
6. Certain rents were due the parties from third parties. Those rents were adjusted as of February 1, 1989. That was a benefit to the buyers, Konovers.
7. The cash to be paid Patrons was due February 1, 1989. The interest due on that cash until February 8, 1989 is $27,568.45. That sum is due Patrons "as damages for the detention of money after it became payable." Conn. Gen. Stats. 37-3a.
8. Plaintiffs' complaint claims a "breach of the terms of the Agreement at Paragraph 8" in that "Konover failed to pay the cash portion of the purchase price on February 1, 1989. Konovers did so fail. That is a breach. A breach is wrongful and, thus, interest may begin to accrue therefrom.
Re "Andrews"
A. As a Major Obligation
a. Paragraph 10 of the Agreement provided that "the [Buyer] will be responsible for the cost of any repairs, replacements, additions, improvements or any other obligations incurred from and after May 15, 1988, with respect to each Property(s) which repairs, replacements, additions, improvements or other obligations either alone or in a series of related transactions creates an obligation which, after deducting that portion reimbursable by tenants, exceeds $10,000.00 to the entity owning a Property (herein referred to as a "Major Obligation)."
10. The purpose of that paragraph was to reimburse the seller for monies taken out of the property accounts maintained for the parties for those items of improvements, maintenance and repair of the properties that exceeded $10,000.00 in any one transaction. The concept was that such payments would redound to the benefit of the buyer.
11. The major obligation at Andrews is the construction of additions and alterations to that shopping center to accommodate a new tenant, the United States Postal Service.
12. On March 24, 1988, Marvin Patron, on behalf of that Konover/Patron entity that owned Andrews, signed an Agreement CT Page 3601 to Lease with the Postal Service. The Postal Service accepted that Agreement to Lease on May 10, 1988.
13. Paragraph 5 of the Agreement to Lease contains the following language.
 5. The following paragraphs, riders, drawings, specifications, forms and/or documents are added and are made a part of this agreement:
10. This agreement is entered into with the understanding that the space will be modified for postal use at postal expense. Lessor waives right to request restoration of premises to present condition at termination of lease.
11. The required modifications and alterations will be accomplished by the lessor with architectural plans, specifications and construction being coordinated through the Postal Service. Architectural plans and specifications will be provided by lessor to the Postal Service for review and approval, based upon design intent drawing and scope of work provided by USPS. The total cost of the modifications will be submitted to the Postal Service for review and approval. (See attached for remaining paragraphs).
14. Thereafter, on July 5, 1988, a contract for the contemplated construction was entered into with Duro Construction Corporation for a "Lump Sum of $438,758.00." Article 7 of that contract recites the "Contract Documents" and does not mention the Lease.
15. Until the execution of that contract on July 5, 1988, the court infers that the "total cost of the modifications" had not yet been "submitted to the Postal Service for review and approval." Thus, the creation of the obligation occurred after May 15, 1988 and Patrons are due $181,963.67 for that major obligation.
16. The lease contemplated by the Agreement to Lease was "not to be signed until the premises [were] ready for delivery."
17. The Agreement in paragraph 18(b) dealing with the reconciliation of outstanding cash balances and deficits provides that ". . . adjustments shall be made with respect to CT Page 3602 cash balances as they exist as of Closing and shall be accomplished within 30 days of Closing."
18. With respect to major obligations, paragraph 10 provided that "it is intended by the Parties that . . . when the cash accounts are substantially adjusted . . ., there shall be an adjustment in favor of the [seller] equal to the [seller's] pro-rata share of the cost of such Major Obligations."
19. Thirty days after the closing was March 9, 1989.
20. The parties had agreed pre-closing that the accountants, Sigal, Patron and Lamson, would calculate the cash account and certain other post-closing adjustments. As of March 9, 1989, they had not completed that work.
21. The Patrons provided the accountants with the financial information in regard to all of the properties which they managed and within a time frame which did not delay the accountants' work.
22. The Konovers did not supply the information to the accountants necessary for them to complete their major obligations analysis.
23. The accountants finished their work in late June of 1989, forwarded their findings to Michael Konover who, in turn, furnished those findings to the Patrons' counsel by letter of June 27, 1989.
24. None of the properties managed by the "others", i.e., not Konovers or Patrons, had an obligation that met the Agreement's definition of a major obligation." Thus, the delay was caused by Konovers and their retention of the monies was wrongful.
25. Plaintiffs are entitled to prejudgment interest on the total of the major obligation, including Andrews, from January 1, 1991 to December 30, 1992. Justice demands this result.
26. Plaintiffs are entitled to prejudgment interest on the "net cash adjustments from April 1, 1989. Justice demands this result. CT Page 3603
27. The Agreement in paragraph 20 provides each party with a method to protect itself from having to pay interest in the event of a "bona fide dispute" but Konovers never availed themselves of that opportunity.
28. The other major obligations due the Patrons are:
 Carbondale $28,377.00 Hammonton 48,433.48 Middletown 18,682.00 Odgensburg 80,760.00 Saranac 5,729.00 Stroudsberg 56,991.00 Palm Beach 7,798.00
When they are added to "Andrews" the net total for major obligations due Patrons is $419,734.15.
Re Carbondale
29. The title to Carbondale was in LL Shopping Centers, Inc. (LL) prior to December 31, 1988.
30. Konovers dissolved LL in December 1988, and title to Carbondale was conveyed to a partnership created by and for the Konovers.
31. A transfer tax was assessed by taxing authorities in Pennsylvania in connection with the pre-closing conveyance by the Konovers from LL to the defendants' new partnership in December 1988, which assessment is under appeal.
32. The decision to terminate LL was made only by Konovers.
33. Before the conveyance of Carbondale from LL to the partnership, Konovers knew that they were the high bidders.
34. Under paragraph 18 of Exhibit A, page 20, it was the high bidders' election to terminate corporations.
35. It was the high bidders' responsibility for any costs associated with such an election to terminate and thus was Konovers. CT Page 3604
36. Konovers had not paid any tax in regard to the Carbondale issue.
37. The claimed tax assessment on Carbondale arose from the dissolution of LL in December of 1988, not from the transfer from the Patrons to the Konovers in February 1989.
Re Seymour
38. The Tri-Town Plaza in Seymour is situated on two parcels of land, one of which is under a ground lease on which there is an alleged title problem.
39. The Seymour title problem arose in the 1960's, and for approximately 30 years, the property has been managed and rents collected by the Konovers without interference.
40. Exhibit A, paragraph 12, page 17 of the Agreement provides that the properties were to be conveyed "as is" without any warranties of title, except for unilateral encumbrances.
41. Paragraphs 12 and 13 of the Agreement, provides that any defect in title "which had occurred for the mutual benefit of the parties" is not actionable.
42. Prior to this litigation there was no claim for breach of warranty in regard to Seymour.
43. No payment was made under protest in regard to the Seymour property as provided under the Agreement, paragraph 20. No escrow fund was set up in regard to Seymour.
44. Konovers still collect the rents and control the operations of the Seymour property.
Re Insurance Program and Insurance Reserve
45. The Agreement does not provide for an insurance reserve.
46. The insurance reserve was a standard adjustment under the Agreement. The issue of the insurance reserve was submitted to arbitration along with all other issues CT Page 3605 regarding standard adjustments. The arbitrator made no award regarding this claim.
47. In regard to the insurance program, the defendants arbitrarily allocated portions of the premiums under an umbrella policy or policies amongst various partnerships even though the partnerships contained different partners. The portions of the premiums were estimates. To the extent there were overcharges in regard to said portions of the premiums said funds were not maintained or isolated in an insurance reserve.
48. No interest was paid in regard to excessive insurance premiums reserved by the defendants.
49. Konovers administered the insurance plan alone.
Re Interest
50. The plaintiffs fully performed their contractual obligations under the Agreement.
51. Konovers maintained and controlled the property account which belonged to both parties, known as the KP Associates account.
52. The KP Associates' account represented cash from the various properties. This was the actual cash owned by and belonging in part to Patrons.
53. Konovers used funds from that account for their sole benefit after the closing.
54. The Konovers' family got the use of said funds.
55. No cash reserve was maintained by the Konovers for the benefit of Patrons.
56. Konovers used some of the cash funds for insurance premiums including some that went for the alleged insurance "reserve."
57. Konovers used some of the RP Associates' account to pay the mortgage to Patrons. CT Page 3606
58. Konovers controlled the use of such funds and transferred monies from the joint accounts to the Konovers' family limited partnership.
59. Payment of cash adjustments and major obligations was required to take place within 30 days of the closing, or no later than March 8, 1989.
Re Attorney's Fees
60. The Agreement provides for attorney's fees to be awarded to a successful party.
61. Patrons have paid the law firm of Day, Berry 
Howard $20,000.00 for attorney's fees in connection with this matter.
62. The legal fees due David Hannan through trial are $30,870.30.
63. Konovers are due a credit for attorney's fees from the arbitration of $9,125.00.
64. Richard Weinstein's attorney's fees on behalf of the plaintiffs are $50,000.00.
65. The plaintiffs paid a portion of the Sorokin and Sorokin fees because that firm handled certain aspects of the closing.
N. O'NEILL, J.